815 A.2d 976

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. PORFIRIO JIMENEZ, DEFENDANT–
RESPONDENT.

Argued November 6, 2002—Decided February 27, 2003.

476

478

*Joseph Connor, Jr.*, Assistant Prosecutor, argued the cause for appellant (*Michael M. Rubbinaccio*, Morris County Prosecutor, attorney).

*Joseph E. Krakora*, Deputy Public Defender II, argued the cause for respondent (*Yvonne Smith Segars*, Public Defender, attorney).

*Carol M. Henderson*, Assistant Attorney General, argued the cause for *amicus curiae*, Attorney General of New Jersey (*Peter C. Harvey*, Acting Attorney General, attorney).

The opinion of the Court was delivered by

ALBIN, J.

In this capital case, we must decide whether to disqualify one of the two public defenders representing defendant because of her previous one-day representation of a client who was questioned during the investigation but found to have no connection with the murder. We conclude that the facts do not present a reasonable basis to deny defendant counsel of his choice based on a conflict of interest or an appearance of impropriety.

## I.

On May 20, 2001, ten-year-old Walter Contreras attended a local carnival and did not return home. In the early morning hours of the next day, he was reported missing, sparking a massive search. The search ended tragically on May 22, 2001, with the discovery of his lifeless body near the Whippany River in Morristown. The young boy had suffered multiple stab wounds, and his head had been bludgeoned with a garden tool. He also had been sexually assaulted, and evidence of semen was found in his underpants.

A thorough and extensive investigation in which "hundreds of people" were interviewed ultimately led the police to defendant. On May 21, 2001, the canvassing of a playground approximately one mile from where the body of the murdered boy was found uncovered a pair of bloody blue jeans that were later determined to have no connection with the murder. Four days later, another search of the playground led to the discovery of a sweater with a

distinctive pattern consisting of blue and black triangle shapes on a light blue background with black trim at the neck, waist, and sleeves. The sweater also had unidentifiable stains presumptive for human blood. Viewing the sweater as a possible link to the murder, the police showed photographs of the sweater to numerous people in the Morristown area.

At least fourteen people were identified as possibly wearing the sweater found in the playground. Two persons reported to the police that they had seen defendant wearing the sweater. One of the two was an interpreter who had worked on a domestic violence crisis team on cases involving defendant.

On May 28, 2001, the Morristown Police secured two warrants, one authorizing the search of defendant's residence and the other the taking of DNA samples from defendant. Defendant's DNA samples matched the semen found in the young boy's underpants. A warrant for the arrest of defendant for the murder of Walter Contreras was issued on June 6, 2001. The next day, defendant was arrested and in a lengthy confession gave details of the murder. The Office of the Public Defender assigned Deputy Public Defender Dolores Mann (Morris County Region) and First Assistant Public Defender Joseph Krakora (Essex County Region) to represent defendant.

In September 2001, a Morris County Grand Jury returned a seven-count indictment, charging defendant with murder in violation of *N.J.S.A.* 2C:11–3a(1) and *N.J.S.A.* 2C:11–3a(2) (count one), two counts of felony murder in violation of *N.J.S.A.* 2C:11–3a(3) (counts two and four), kidnapping in violation of *N.J.S.A.* 2C:13–1b (count three), attempted aggravated sexual assault in violation of *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:14–2a(1) (count five), attempted aggravated sexual assault in violation of *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:14–2a(6) (count six), and third-degree possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4d (count seven). On October 22, 2001, the State signaled its intent to seek the death penalty by filing a Notice of Aggravating Factors pursuant to *N.J.S.A.* 2C:11–3c(1) and *Rule* 3:13–4.

During the murder investigation, Ray Hughes was one of the many people interviewed by the police. Hughes had been identified by several people as wearing a sweater similar to that found in the playground. When the police questioned Hughes, he had a knife in his possession, which, it was later determined, could not have inflicted any of the wounds on the victim. Hughes consented to a polygraph test that proved to be inconclusive.

On May 30, 2001, eight days after the discovery of the victim's body and eight days before defendant's arrest, Hughes threatened to kill a woman named Jolene Proctor, apparently because she gave information to the police that led to his interrogation in the murder investigation. Hughes was arrested and later indicted for uttering terroristic threats in violation of *N.J.S.A.* 2C:12–3b (a third-degree crime). On July 18, 2001, Hughes pled guilty to the downgraded petty disorderly persons offense of harassment, *N.J.S.A.* 2C:33–4, and the same day was sentenced to the fifty days he had already served in the county jail. Deputy Public Defender Mann represented Hughes at his plea and sentencing. That one day, July 18th, constituted the entire duration of Mann's representation of Hughes. The State made no motion at that time to disqualify Mann from representing Hughes despite its knowledge that she also represented defendant on the murder charges.

On December 20, 2001, the State filed a motion to disqualify Mann as counsel for defendant because of her one-day representation of Hughes. On February 11, 2002, the State argued that there was an objective basis to assert a defense of third-party guilt against Hughes and, therefore, Mann would be impaired in her representation of defendant. The State made clear that it neither believed nor had evidence that Hughes was in any way involved in the murder. Moreover, the State attributed the threat against Jolene Proctor to Hughes' unpleasant personality and to the fact that he did not appreciate having his name involved in the

murder investigation, not as a sign of consciousness of guilt of the murder.

Nevertheless, the State took the position that there was sufficient evidence for defense counsel to argue that Hughes committed the murder based on the testimony of witnesses who allegedly saw Hughes wearing the distinctive sweater coupled with Hughes' threats to Proctor. The State expressed concern that Mann's prior representation of Hughes precluded her from properly considering the defense of third-party guilt, thereby creating an actual conflict and an appearance of impropriety that would threaten the integrity of a capital conviction of defendant on appeal. The theory of the State is that defendant discarded the bloody sweater while in flight from the crime scene. According to the State, placing the sweater on Hughes to diminish the evidence of defendant's guilt should be one of the options available to the defense. The State noted its fear that the out-of-hand rejection of this strategy by the defense, impaired by a conflict, would later be second-guessed in a post-conviction relief hearing. The State did, however, place in perspective the relatively minor importance of the sweater in the overall prosecution of defendant by its admission that there was no "definitive link" between the sweater and defendant or the victim.

The defense argued that there was no evidence connecting the sweater directly to the murder and, therefore, no evidence tying Hughes to the crime, despite the claims by witnesses that Hughes wore the distinctive sweater. In light of the forensic evidence and defendant's confession, the defense submitted that any objectively reasonable attorney would know that to attempt to implicate Hughes falsely would undoubtedly fail and work to the detriment of defendant. The defense saw no potential claim of third-party guilt involving Hughes.

The motion judge denied the State's application to disqualify Mann. He noted that neither the State nor the defense intended to call Hughes as a witness. The judge found Hughes' involvement so attenuated that there was no reasonable basis to claim an

appearance of impropriety. At the hearing, the judge addressed defendant directly on the issue of his choice of counsel and satisfied himself that defendant consented to continued representation by Mann.

The Appellate Division denied the State's motion for leave to appeal. The State then moved for leave to appeal to this Court. While that motion was pending, the State filed another motion to disqualify Mann based on assertions in the defense brief in support of a motion to suppress the DNA evidence and the confession. The defense has challenged the sufficiency of the affidavit in support of the warrants authorizing the search of defendant's home and the taking of the DNA samples. In its suppression brief, the defense argued that the affidavit in support of the warrants was deficient because it only identified the two people who saw defendant wearing the same distinctive sweater found in the playground. The affidavit failed to mention the names of at least fourteen other people, including Hughes, who had reportedly been seen wearing a similar sweater.

On May 17, 2002, the same motion judge who had decided the first disqualification motion heard additional arguments on the subject. The State contended that the defense had taken a position in its suppression motion inconsistent with the one advanced at the disqualification motion. The State viewed the defense claim that the affidavit should have included information regarding Ray Hughes and the other thirteen people sighted wearing the distinctive sweater as an admission that third-party guilt was a viable option. The State, however, did not waver from its position that Hughes was not an "alternate suspect" and had nothing "to do with the crime."

The defense responded that there was a meaningful distinction between, on the one hand, arguing that there was no probable cause for the issuance of the warrants and, on the other, arguing that there was no basis for a theory of third-party guilt involving Hughes. The motion judge again denied the State's motion to disqualify Mann. The judge noted that the defense was simply

saying that Hughes was investigated along with hundreds of other people and that this information was known to the State and should have been included in the affidavit as part of the probable cause determination for the issuance of the warrants. He still found the appearance of impropriety no more than a "fanciful possibility." The judge also recited that the State "knew that Ms. Mann was representing [Hughes], and knew that she was also representing [defendant]," but failed to move to disqualify Mann until months following the disposition of the Hughes case.

This Court granted the State's motion for leave to appeal. 172 *N.J.* 351, 798 *A.*2d 1266 (2002). We also granted the motion of the Attorney General to appear as *amicus.*

## II.

An accused is guaranteed the right to the assistance of counsel in a criminal proceeding, *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10, but not the constitutional right to counsel of his choice. *See Wheat v. United States,* 486 *U.S.* 153, 159, 108 *S.Ct.* 1692, 1697, 100 *L.Ed.*2d 140, 148–49 (1988) (stating that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers"); *State v. Loyal,* 164 *N.J.* 418, 434, 753 *A.*2d 1073 (2000). An accused cannot impress into service an attorney he cannot afford or an attorney who has no desire to represent him. *Wheat, supra,* 486 *U.S.* at 159, 108 *S.Ct.* at 1697, 100 *L.Ed.*2d at 149. Moreover, the scope of an attorney's representation of a client is circumscribed by the Rules of Professional Conduct. Although there is a constitutional presumption in favor of counsel of one's choice, a defendant cannot insist on representation by an attorney where there is an actual conflict of interest or an appearance of impropriety. *Loyal, supra,* 164 *N.J.* at 430, 434, 753 *A.*2d 1073; *State v. Needham,* 298 *N.J.Super.* 100, 103, 688 *A.*2d 1135 (Law Div.1996); *RPC* 1.7; *RPC* 1.9. The Rules of Professional Conduct are designed to assure that, in representing

a client, counsel's judgment is not impaired by divided loyalties or other entangling interests. *State v. Bellucci*, 81 *N.J.* 531, 538, 410 *A.*2d 666 (1980). The Rules are also intended to further a broader societal interest—the integrity of the trial process itself. *Loyal*, *supra*, 164 *N.J.* at 433–34, 753 *A.*2d 1073.

This case implicates two Rules of Professional Conduct, RPC 1.9 and 1.7. *RPC* 1.9 sets forth the responsibilities of an attorney where there is a conflict of interest between a present and former client:

> (a) A lawyer who has represented a client in a matter shall not thereafter:
>
> (1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or
>
> (2) use information relating to the representation to the disadvantage of the former client except as *RPC* 1.6 would permit with respect to a client or when the information has become generally known.

The provisions of *RPC* 1.7(c) are applicable as well to situations covered by this rule. *RPC* 1.7(c) forbids an attorney from representing a client, even in the absence of an actual conflict of interest, where there would be an appearance of impropriety under the circumstances of the case:

> (c) This rule shall not alter the effect of case law or ethics opinions to the effect that:
>
> (1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and
>
> (2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

The following issues are raised in this case. Did Mann represent a client, Hughes, in a case substantially related to that of defendant? Are defendant's interests materially adverse to those of Hughes? Is there a reasonable basis to believe that Mann will use information obtained during the course of her representation of Hughes to that former client's disadvantage or refrain from

using such information to the detriment of defendant? And would an "ordinary knowledgeable citizen acquainted with the facts" conclude that either the clients' or the public's interests would be "disserved" by Mann's representation of defendant?

The answers to these questions are fact sensitive and require a searching review of the record. *See, e.g., Loyal, supra,* 164 *N.J.* at 430, 753 *A.*2d 1073 (citing *In re Opinion No. 415,* 81 *N.J.* 318, 325, 407 *A.*2d 1197 (1979)). The overriding issue in this case is whether Mann is so impaired by her previous representation of Hughes that she will be unable to perform her adversarial role in representing defendant. That determination requires a consideration whether there is any reasonable prospect of asserting the defense of third-party guilt.

 A defendant is entitled to prove his innocence by showing that someone else committed the crime with which he or she is charged. *State v. Koedatich,* 112 *N.J.* 225, 297, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989); *State v. Sturdivant,* 31 *N.J.* 165, 179, 155 *A.*2d 771 (1959), *cert. denied,* 362 *U.S.* 956, 80 *S.Ct.* 873, 4 *L.Ed.*2d 873 (1960). The right to the defense of third-party guilt is of constitutional dimension. *Koedatich, supra,* 112 *N.J.* at 297, 548 *A.*2d 939. There must, however, be some evidence of third-party guilt to permit the defense to argue the point. " '[T]he third party evidence need not show substantial proof of a probability that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' " *Id.* at 299, 548 *A.*2d 939 (quoting *People v. Hall,* 41 *Cal.*3d 826, 226 *Cal.Rptr.* 112, 718 *P.*2d 99, 103 (1986) (internal quotation marks omitted)).

*State v. Sturdivant, supra,* involved a capital prosecution for the sodomy-murder of a four-and-one-half-year-old girl, who died as a result of hemorrhaging in the rectum. 31 *N.J.* at 169, 182, 155 *A.*2d 771. The defendant's strategy was to shift the blame for the death of the young girl to his niece. Defendant intended to call his sister to testify that her daughter had placed a can opener into the vagina and rectum of the victim one week before the victim's

death and on that same occasion the victim had placed a can opener into her own rectum. *Id.* at 178, 155 *A.*2d 771. The sister's testimony concerning the conduct of defendant's niece was held inadmissible by the trial court because there was no evidence that the niece and the victim were together at any time during the intervening week and there was no offer of any proof that the injuries allegedly inflicted by the niece a week earlier caused the victim's death. *Id.* at 180, 181, 155 *A.*2d 771. In speaking for the Court, Chief Justice Weintraub observed:

> It would seem in principle to be sufficient if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.... We think it not enough to prove some hostile event and leave its connection with the case to mere conjecture. Somewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case.
>
> [*Id.* at 179, 155 *A.*2d 771.]

With no evidential link, this Court agreed with the trial judge that the jury could not be left to make a speculative connection between the niece's act and the death of the victim. *Id.* at 182, 155 *A.*2d 771.

*State v. Koedatich, supra,* also a capital case, presents another example of the limits of third-party guilt as a defense. *Koedatich* involved the savage rape and slaying of an eighteen-year-old high school senior and cheerleader, Amie Hoffman. 112 *N.J.* at 231–32, 548 *A.*2d 939. The victim had been last seen alive in the parking lot of the Morris County Mall. *Id.* at 231, 548 *A.*2d 939. Two days after her disappearance, her body was discovered in a water retention tank located in a secluded reservoir area of Randolph Township. *Id.* at 232, 234, 548 *A.*2d 939. The police investigation centered on interviewing people in the vicinity of the mall and the reservoir on the date of the victim's disappearance. *Id.* at 236, 548 *A.*2d 939. Ultimately, James Koedatich became the focus of the investigation, and eyewitness testimony and forensic evidence found in his car, a large Chevrolet, tied him to the victim and the murder. *Id.* at 238–39, 548 *A.*2d 939.

The defendant unsuccessfully attempted to introduce a variety of evidence regarding the possible guilt of a third party, Kevin

Sheehan. *Id.* at 297–312, 548 *A.*2d 939. For example, the trial court blocked the defendant's effort to introduce evidence that: 1) Sheehan, a part-time football coach at the victim's high school, made obscene phone calls to a telephone located outside the cheerleaders' locker room; 2) Sheehan owned a small sports car to support the account of a woman who, living near the murder scene, purportedly heard a small sports car in the vicinity at the approximate time of the murder; 3) Sheehan gave conflicting alibis, sweated profusely, wanted to contact his attorney, and eventually ran into his house when questioned by investigators; and 4) Sheehan made an alleged declaration against interest, telling his mother to " 'hide the knife in the garage' " after he was called in for questioning. *Id.* at 302–03, 305–09, 548 *A.*2d 939.

The defendant claimed that the combined effect of this evidence supported the inference that the murderer was Sheehan rather than the defendant. *Id.* at 297, 548 *A.*2d 939. The trial court did not find any evidence connecting Sheehan to the crime and summed up the weakness of the third-party guilt defense in the following way: "What have we heard *at all* linking Mr. Sheehan with Amie Hoffman? I haven't heard a thing linking Mr. Sheehan with Amie Hoffman." *Id.* at 308, 548 *A.*2d 939.

We found no fault with the trial court's evidentiary rulings. We affirmed the trial court's decision to bar testimony regarding the alleged obscene phone calls because it was premised on inadmissible hearsay and lacked probative value. *Id.* at 303–04, 548 *A.*2d 939. The phone calls "simply raised a possible ground of suspicion without providing any direct connection with the murder of [the victim]." *Id.* at 303, 548 *A.*2d 939. There was no "causal link between the phone calls" and the murder. *Ibid.*

The trial court admitted the testimony of the woman who purportedly heard the sound of a small sports car in the reservoir area around the time of the murder to allow the defense to argue that a car other than the defendant's Chevrolet may have been in the vicinity of the crime. *Id.* at 305, 548 *A.*2d 939. Such evidence did have a legitimate tendency to prove that a third party could

have committed the crime. However, we agreed with the trial court that Sheehan's possession of a small sports car at the time of the murder did not draw a sufficient link between Sheehan and the victim and hence was inadmissible. *Id.* at 306, 548 *A.*2d 939. Moreover, Sheehan's sweating, giving conflicting alibis, requesting an attorney, and other anxious conduct during an interrogation were not evidence of consciousness of guilt of a murder when there was no other evidence linking him in any way to the victim. *Id.* at 308, 548 *A.*2d 939.

Finally, we also held that Sheehan's command to his mother to " 'hide the knife in the garage' " was properly excluded from evidence on the ground of lack of relevance. Again, there was not a sufficient link between Sheehan, the victim, or the commission of the crime. *Id.* at 310, 311, 548 *A.*2d 939. This Court was satisfied that the trial record contained no evidence supporting the third-party guilt of Sheehan. *Id.* at 312, 548 *A.*2d 939.

With these cases in mind, we begin by stating the obvious: in the circumstances of this case, a viable claim of third-party guilt will trigger an actual conflict and an appearance of impropriety. It is not necessary to decide whether Mann represented defendant and Hughes in substantially related matters because there is no reasonable basis to conclude that defendant's interests are materially adverse to Hughes.[1] Both the State and the defense have abjured any intention of calling Hughes as a witness. Both the State and the defense have attested that there is no reason to believe, or evidence to support, that Hughes was involved in the murder of Walter Contreras. Hughes was never placed in the company of the victim or in the vicinity of the crime. This is not a case in which defense counsel will have to cross-examine a former client or call to the stand a former client who may incriminate

---

[1] Without addressing whether the Jimenez and Hughes matters are substantially related, the defense conceded during oral argument before this Court that a viable defense of third-party guilt would likely require Mann's disqualification from the case.

himself and exculpate the present client. *Compare, e.g., Loyal, supra,* 164 *N.J.* at 429–34, 753 *A.2d* 1073; *State v. Catanoso,* 222 *N.J.Super.* 641, 537 *A.2d* 794 (Law Div.1987).

There is no suggestion in the record that Mann learned anything in her representation of Hughes that would benefit defendant. Needless to say, if Mann discovered any information during her attorney-client relationship with Hughes that would suggest even remotely that he was involved in the crime, she would be duty-bound to withdraw from her representation of defendant.

The State's concern is based solely on the accounts of several witnesses who allegedly observed Hughes wearing the same type of sweater that the State will argue defendant discarded in flight from his crime. The sweater standing alone does not make the case for the State or offer a direct link to the crime. The sweater had no identifiable bloodstains from either the victim or any other party and was found a mile from the murder scene. At least fourteen other people were identified as having worn a similar sweater. Sweaters of this very same style may have been sold in outlets in Morris County and the surrounding areas. The sweater only becomes relevant in the context of other compelling evidence offered against defendant, a confession in which defendant gave details of the murder and forensic evidence matching his DNA to the semen found in the underpants of the victim.

The heart of the case is the confession and the DNA evidence. Only in light of the confession and the DNA evidence is the State able to argue any meaningful connection between the sweater witnesses observed defendant wearing and the murder of Walter Contreras. The State has not argued that in the absence of the confession and DNA evidence the sweater is sufficient to tie defendant to this crime. That a person other than defendant may have been seen wearing a similar sweater, at most, nibbles away at the margins of the State's case. If the defense decides to pursue this strategy, it can do so by establishing that fourteen other people were sighted wearing a similar sweater. The evi-

dence, however, no more implicates Ray Hughes in the commission of the crime than the other thirteen people associated with the distinctive sweater.

Hughes' threat to Jolene Proctor, apparently because her statement to the police led to his interrogation, may have increased the level of interest in Hughes by law enforcement authorities, but it did not implicate him in the murder. The threat, in fact, was taken by the State as a crude expression of pique by Hughes that his name was dragged into the investigation. Without any evidence tying Hughes to the murder, the threat can hardly be deemed as evidence of consciousness of guilt of the crime or, in other words, an implicit admission that he committed the brutal slaying. *Koedatich, supra*, 112 *N.J.* at 306–08, 548 *A.*2d 939. The threat, at best, is insolubly ambiguous concerning the murder and devoid of any evidential meaning in defendant's case. The threat has no "tendency in reason to prove or disprove any fact of consequence" to defendant's culpability in the crime and, therefore, would be inadmissible, given the record before this Court. *N.J.R.E.* 401. Reasonable doubt can arise from the introduction of relevant third-party guilt. There is no evidence, however, linking Hughes to the crime that would permit such an argument. *Koedatich, supra*, 112 *N.J.* at 304, 548 *A.*2d 939 (stating that "'[d]isconnected and remote acts, outside the crime itself ... which can have no other effect ... than to cast a *bare* suspicion on another, or to raise a conjectural inference as to the commission of the crime by another [are] not admissible'") (quoting *State v. LaRette*, 648 *S.W.*2d 96, 103 (Mo.), *cert. denied*, 464 *U.S.* 908, 104 *S.Ct.* 262, 78 *L.Ed.*2d 246 (1983)). *See also State v. Loftin*, 287 *N.J.Super.* 76, 103, 670 *A.*2d 557 (App.Div.) (affirming trial court's exclusion of evidence where proffer of third-party guilt was incapable of raising reasonable doubt on issue of defendant's guilt), *certif. denied*, 144 *N.J.* 175, 675 *A.*2d 1123 (1996). In conclusion, there is no more substance to the third-party guilt defense in this case than in *Sturdivant* or *Koedatich.*

Our dissenting colleagues take the position that the threat to Proctor was admissible as evidence of Hughes' consciousness of guilt of the Contreras murder, citing as support *State v. Rechtschaffer*, 70 *N.J.* 395, 360 *A.*2d 362 (1976), and *State v. West*, 145 *N.J.Super.* 226, 367 *A.*2d 453 (App.Div.1976), *certif. denied*, 73 *N.J.* 67, 372 *A.*2d 332 (1977). These cases are inapposite. *Rechtschaffer* involved a defendant who had attempted a sale of drugs to an undercover police officer. After his arrest, the defendant told a police officer that if he learned the identity of the person who " 'informed on him he would take his hunting knife and kill him.' " 70 *N.J.* at 401, 360 *A.*2d 362. This Court upheld the admissibility of that threat because it established defendant's consciousness of guilt of the drug offense. *Id.* at 413, 415, 360 *A.*2d 362. In *Rechtschaffer*, there was direct evidence linking the defendant to the underlying crime through the testimony of the undercover police officer. *Id.* at 400–01, 413, 360 *A.*2d 362. Here, there is no direct or circumstantial evidence tying Hughes to the Contreras murder. *State v. West, supra,* offers little support to the dissent because it stands for the unremarkable proposition that a declaration against interest that is *relevant* may be admitted if it raises a reasonable doubt as to defendant's guilt. 145 *N.J.Super.* at 233, 367 *A.*2d 453.

It also bears mentioning again that defendant has the benefit of representation by two lawyers. No one has questioned the independence or objectivity of Joseph Krakora, an experienced and seasoned defense attorney, or suggested that he is compromised by divided loyalty. Krakora is well versed in the practical realities of defending a capital case and, at oral argument before this Court, expressed his view that attempting to implicate Hughes on such threadbare evidence would impair the defense and likely strip it of all credibility:

> I don't agree that the evidence is even admissible if offered to show that Hughes participated in the crime. But beyond that, as a tactical matter, my experience has taught me for years that to put up a defense that is based on nothing, that doesn't advance in any meaningful way to a jury your client's cause, is worse than not doing it at all. To put in completely weak, unsubstantiated evidence, even if

deemed relevant by a trial judge, that somebody else participated in the crime, with no proof of that whatsoever, in my view ... is the worst possible approach.

A defense of third-party guilt, according to Krakora, does not hinge on the outcome of a judicial determination on the admissibility of the confession or the DNA evidence. He told this Court that "the case against Hughes doesn't become any better because some portion of the case against Jimenez is deemed to be inadmissible." The stakes are high in a capital case. A tactical blunder—proffering a specious defense—can have fatal consequences.

We conclude that there is no actual conflict of interest or appearance of impropriety in Mann's serving as co-counsel to this capital defendant. Mann's representation of Jimenez was never materially adverse to her representation of Hughes, including when she represented Hughes at the time of his plea. "An appearance of impropriety must be 'something more than a fanciful possibility' and 'must have some reasonable basis.'" *Loyal, supra,* 164 *N.J.* at 429, 753 *A.2d* 1073 (quoting *In re Opinion No. 653,* 132 *N.J.* 124, 132, 623 *A.2d* 241 (1993)). An "ordinary knowledgeable citizen acquainted with the facts" would not have any reasonable basis to believe that there is a plausible third-party guilt case involving Hughes and, therefore, Mann's remaining as counsel in this case will not disserve the interests of defendant, Hughes, or the public.

The motion judge inquired of defendant, although not at great length, whether he wished Mann to continue as his attorney. Defendant gave his consent. Although the rationale of our decision does not require consent under the Rules of Professional Conduct, we add these words of caution. Given the interests at stake in this capital case, prudence dictates that the judge should conduct a colloquy on the record and determine that defendant knows the full circumstances of Mann's prior representation of Hughes. Defendant should be informed that several witnesses identified Hughes as having worn the distinctive sweater that the State will argue defendant abandoned after the murder; that Hughes threatened a person who caused him to be interviewed by

the police; and that Hughes pled guilty to harassing that person. Defendant should also be informed on the record why defense counsel does not intend to pursue a defense of third-party guilt involving Hughes. With a complete knowledge and understanding of the import of these facts, defendant may then voluntarily consent to have Mann continue to represent him.

The defense attorneys in this case know that falsely implicating Hughes in the murder is a bad strategy that will damage their credibility and increase the likelihood of irreparably harming their client. The Rules of Professional Conduct cannot compel the removal of an attorney because, as a tactical matter, she should keep open the option of a third-party guilt defense where there is no reasonable basis to assert the defense.

We therefore affirm the judgment of the motion judge and remand for consideration in accordance with this opinion.

LONG, J., dissenting.

Whether Dolores Mann's affront to our ethic rules was a conflict, a potential conflict, or an appearance of impropriety may be subject to dispute; what is not open to question is that she should have been disqualified from continuing to represent defendant, Porfirio Jimenez, as he fights for his life in this capital murder case.

On June 8, 2001, Jimenez was charged with the kidnapping and murder of Walter Contreras, and Dolores Mann became his lawyer. Thereafter, simultaneous with her representation of Jimenez, Mann became counsel for Raymond Hughes who was also a suspect in the Contreras killing. Hughes had been charged with terroristic threats arising out of the investigation of the murder case and on July 18, 2001, with Mann at his side, entered a plea to harassment.

Hughes had been tied to the murder case through a sweater that the police thought was worn by the killer. He submitted to a polygraph examination that did not exonerate him. Thereafter, he

threatened a witness that he believed had given the police information about his connection to the homicide. That was the source of the terroristic threats charge.

Those threats were legally admissible evidence of Hughes's consciousness of guilt of the murder. *State v. Rechtschaffer,* 70 *N.J.* 395, 413, 360 *A.*2d 362 (1976) (stating that defendant's statement that he would kill person who informed against him was admissible as statement against interest); *State v. West,* 145 *N.J.Super.* 226, 232–33, 367 *A.*2d 453 (App.Div.1976) (holding rule applicable to witness), *certif. denied,* 73 *N.J.* 67, 372 *A.*2d 332 (1977). Thus, when Mann represented Hughes at the plea and allowed him to place on the record a benign explanation for the threats, her actions directly contravened the interests of Jimenez.

The State recognized the problem of dual representation in which Mann had become embroiled and moved to disqualify her. To extricate herself from the situation, Mann then took the position that she would not use a third-party guilt defense involving Hughes in her representation of Jimenez. That did not eliminate the conflict but only highlighted it.

The majority appears to accept the notion that Mann was free to forswear use of third-party guilt because the defense is not a viable one. I agree that it is doubtful that the terroristic threats would have been admissible at the trial of Jimenez without further evidence linking Hughes to the murder. However, at the incipient stage of the case at which Mann jettisoned third-party guilt, she had no way to predict whether industrious investigation would uncover such a link. By forswearing possible defenses at such an early stage, no matter how weak they might have appeared, for reasons external to the merits and related to her representation of Hughes, Mann was in a position of conflict. As a confidante and representative of both defendants, she could not be faithful to either. The interdiction of that kind of simultaneous conflicting representation is hornbook law, reaffirmed by us as recently as last month in *State ex rel. S.G.,* 175 N.J. 132, 138–40, 814 A.2d 612 (2003) (citing *RPC* 1.7). It may be, as the majority suggests, that

at this point, the defense can say with assurance that third-party guilt cannot be advanced. That simply does not validate Mann's prior conduct.

At the very least, this case involves an appearance of impropriety. *See RPC* 1.7(c) (setting forth appearance of impropriety rule). Although debate is raging over the continued vitality of that concept in other contexts, it is a critical factor in a capital case, where public confidence in the fairness of the proceedings leading to the verdict is a paramount consideration. *State v. Loyal,* 164 *N.J.* 418, 430, 753 *A.*2d 1073 (2000) (observing that when appearance of impropriety is found in criminal matter, disqualification of attorney is regularly required); *State v. Rivera,* 232 *N.J.Super.* 165, 177–78, 556 *A.*2d 1227 (App.Div.) (recognizing that attorneys may be disqualified under conflict of interest rules where defendant's right to counsel of choice is outweighed by need to preserve public confidence in judicial system), *certif. denied,* 117 *N.J.* 169, 564 *A.*2d 885 (1989).

Mann's actions will shadow the trial of this case. If there is a conviction, we will see this issue again on direct appeal and post-conviction relief, as will the federal court. Standing alone, that is a matter that Mann should have taken into account in her ill-considered dual representation of Jimenez and Hughes. Failing that, our courts should have intervened at the early stages of the case.

Justices COLEMAN and LaVECCHIA join in this dissent.

*For affirming and remanding*—Chief Justice PORITZ and Justices VERNIERO, ZAZZALI and ALBIN—4.

*For reversing*—Justices COLEMAN LONG and LaVECCHIA—3.