840 A.2d 279 (2004)
366 N.J. Super. 30
STATE of New Jersey, Plaintiff-Appellant,
v.
James DAVIS, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Yuri Jones, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Michael Gore, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 9, 2003.
Decided January 16, 2004.
*281 Kimberly Lacken, Assistant Prosecutor, Mercer County, argued the cause for appellant (Joseph L. Bocchini, Jr., Mercer County Prosecutor, attorney, Ms. Lacken on the brief).
Gerald Boswell, Toms River, argued the cause for respondents (Yvonne Smith Segars, Public Defender, attorney, Gerald Boswell and Robert J. Konzelmann, Assistant Deputy Public Defender, on the brief).
Mark Paul Cronin, Trenton, argued the cause for amicus curiae the Attorney General of the State of New Jersey (Peter C. Harvey, Attorney General, Mr. Cronin on the brief).
Before Judges STERN, LEFELT and PAYNE.
*280 The opinion of the court was delivered by
PAYNE, J.A.D.
This appeal raises the novel issue of whether a former public defender, Gerald Boswell, now retained by the Office of the Public Defender (OPD) as a pool attorney to represent two defendants in separate capital murder proceedings and another defendant charged with non-capital murder, must be disqualified from that representation because he has sued the OPD and various former and present OPD employees alleging causes of action arising out of his employment premised on violations of the Law Against Discrimination, the Conscientious Employee Protection Act and common-law defamation. In a lengthy and thoughtful opinion, Judge Maria M. Sypek held that Boswell's suit did not give rise either to a conflict of interest or an appearance of impropriety under RPC 1.7. We affirm.

I.
Until his retirement on July 1, 2002, Boswell was employed as an attorney by the OPD, first in Ocean County, and later in Mercer County. During his tenure in Ocean County, disputes arose between Boswell and Robert L. Tarver, Jr., the former Deputy Public Defender for the OPD's Ocean County office, that initially centered around Boswell's perception that Tarver was neglecting his duties as a public defender while he pursued outside activities, including service as a legal commentator for Court TV and The Early Show with Bryant Gumbel. In June 2001, Boswell reported his conclusions to Acting Public Defender Peter A. Garcia, who on June 14, 2001, appointed Assistant Public Defender Regina Sauter and another individual to investigate Boswell's complaints, as well as cross-complaints by Tarver. The investigation resulted in a report, issued in January 2002, that recommended among other things that Tarver be given management training.
On May 1, 2003, Boswell filed a first amended complaint against the OPD, Tarver, Garcia and Sauter alleging that their conduct following Boswell's report of Tarver's alleged misdeeds was retaliatory, created a hostile work environment, and acted to constructively discharge him from his position as an Assistant Deputy Public Defender, in violation of the Conscientious Employee Protection Act (CEPA), *282 N.J.S.A. 34:19-1 to -8. Additionally, Boswell contended that the retaliatory conduct of Sauter and Garcia and their creation of a hostile work environment following Boswell's complaints against Tarver, who was African-American, constituted reverse racial discrimination in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Additional causes of action were premised upon an alleged conspiracy between Tarver, Garcia and Sauter to harass Boswell, create a hostile work environment and to constructively discharge him in violation of the CEPA and LAD statutes and upon defamation by Garcia and Tarver arising out of the allegedly false statement that Boswell was romantically involved with a reporter for the Asbury Park Press who reported on events occurring in the Ocean County office of the OPD. Of the three named defendants in Boswell's action, only Sauter remains an employee of the OPD. She has no administrative or other authority over Boswell.
While Boswell was still employed by the OPD and after his transfer from Ocean County to a position in Mercer County, Boswell was assigned to defend capital murder and other charges against James Davis and Michael Gore, as well as noncapital murder charges against Yuri Jones. Following Boswell's retirement, he retained his position as defense counsel in the three cases, first as a per diem attorney and then as a death penalty-qualified pool attorney. A present employee of the OPD, Robert J. Konzelmann, has been assigned by the OPD as co-counsel in the two capital cases.
On May 7, 2003, following institution of suit by Boswell, Joseph E. Krakora, Assistant Public Defender and Director of Capital Litigation for the OPD, wrote to the Mercer County judges to whom the Davis, Jones and Gore matters had been assigned. In those letters, Krakora noted Boswell's suit, and then stated:
I am writing to express the OPD's concern that there is a conflict of interest or an appearance of an impropriety created by Boswell's having sued this agency. Specifically, the OPD questions whether it is appropriate for him to seek compensation from this office as outside counsel while suing it, whether it can effectively oversee his handling of this case for fear of further claims of retaliation by him, and whether such an arrangement would compromise the representation of this client by creating a conflict of interest or an appearance of an impropriety. Accordingly, the OPD believes that his case should be reassigned unless all of the following occurs:
1) The Court determines that there is no conflict of interest or appearance of an impropriety.
2) The prosecutor does not seek Mr. Boswell's disqualification.
3) The client consents to his continued representation after full disclosure.
Upon receipt, one judge explicitly declined to act on the letter, reasoning that any action would require the issuance of an advisory opinion. No response was issued by the other two judges.
Thereafter, the State moved to disqualify Boswell in the three cases in motions that were argued in consolidated proceedings before Judge Sypek in the presence of defendants Jones and Gore. Although as the result of logistical problems defendant Davis was not present, the argument was videotaped, and the videotape was viewed by him in Boswell's presence. Following oral argument, Judge Sypek issued a written decision and order denying the State's motion. Additionally, prior to the issuance of her opinion, Judge Sypek conducted a detailed examination of Davis, Jones and *283 Gore to determine their understanding of the basis for the State's motion and the State's arguments. In response to questions by the court, all three indicated orally that they understood the nature of the arguments presented, they had no further questions regarding them, and they wished Boswell to continue as their attorney. A specific waiver was not requested from any of the three.
Following issuance of the court's opinion and order, the State moved before us for leave to appeal, which we granted, holding oral argument both on the motion and on the appeal itself. In both instances, the OPD was invited to participate as amicus in the proceedings, and it declined. An invitation to the Office of the Attorney General was accepted, and it has filed a brief on appeal and participated in oral argument.

II.
On appeal, the State argues, as it did before Judge Sypek, that the existence of Boswell's suit against the OPD may engender either undue deference by the OPD to Boswell or retaliation by it against him, thereby impairing Boswell's ability to properly represent defendants in the actions against them and creating a conflict of interest. Specifically, the State expresses concern that the OPD, fearing further claims of retaliation, may decline to adequately supervise Boswell's work. Alternatively, it may deny Boswell resources that it would otherwise accord to attorneys representing defendants in such circumstances or unjustifiably fail to grant Boswell's specific requests for litigation support. The State posits no adverse action by the individually named defendants, who are no longer in positions in which they can affect Boswell's present performance. We find the State's concerns to be speculative and thus insufficient to constitute grounds for Boswell's disqualification.
At the outset, we stress our conclusion that the State's motion was not frivolous in nature nor offered in bad faith to obtain advantage in ongoing litigation. See Essex Cty. Jail Annex Inmates v. Treffinger, 18 F.Supp.2d 418, 439 (D.N.J.1998)(observing that, for these reasons, motions to disqualify are generally viewed with disfavor). And we have no doubt that the State possesses the standing to pursue its position. Id. at 430-31. The issues raised here are serious ones of first impression. The State, as well as the individual defendants, are entitled to their resolution now before capital and non-capital prosecutions are well underway both as a matter of constitutional prerogative under the Sixth Amendment and as a matter of economy and efficiency. Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); State v. Drisco, 355 N.J.Super. 283, 295, 810 A.2d 81 (App.Div. 2002), certif. denied, 178 N.J. 252, 837 A.2d 1094 (2003). As the Supreme Court recently observed in State ex rel. S.G., 175 N.J. 132, 139-40, 814 A.2d 612 (2003):
In criminal matters, in which the trust between attorney and client has enhanced importance, special vigilance is required because an attorney's divided loyalty can undermine a defendant's Sixth Amendment right to effective assistance of counsel. See, e.g., United States v. Moscony, 927 F.2d 742, 748 (3d Cir.1991) (noting that the defendant's right to effective assistance of counsel includes both adequate representation and right to attorney's conflict-free, undivided loyalty). The Sixth Amendment right to effective assistance of counsel, binding on the States by the Fourteenth Amendment, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), requires a defense attorney's representation *284 to be "untrammeled and unimpaired." State v. Bellucci, 81 N.J. 531, 538, 410 A.2d 666 (1980). Therefore, although a defendant must have a fair opportunity to have counsel of his own choosing, that right must yield when an actual conflict is found. Moscony, supra, 927 F.2d at 749-50.
Accordingly, in the criminal setting we have reinforced that it is incumbent on the courts to ensure that defendants receive conflict-free representation. State v. Loyal, 164 N.J. 418, 433, 753 A.2d 1073 (2000) (emphasizing trial court's responsibility for "assuring fairness and reliability of trial").

[Ibid.]
Moreover, we recognize that the court maintains an independent interest in assuring that conflict-free representation occurs, since the existence of conflict undermines the integrity of the court. S.G., supra, 175 N.J. at 140, 814 A.2d 612 (quoting United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir.1978)). Further, the existence of an unadjudicated conflict is also detrimental to the independent interest of the court to be free from future unjustified attacks over the fairness of the proceedings. Ibid. Adherence to the Rules of Professional Conduct serves not only a client's interests but also the "broader societal interest [in] the integrity of the trial process itself." State v. Jimenez, 175 N.J. 475, 484-85, 815 A.2d 976 (2003) (citing State v. Loyal, 164 N.J. 418, 433-34, 753 A.2d 1073 (2000)).
We note as well the heightened scrutiny of the issues raised that is required because two of the three prosecutions at issue are capital in nature. State v. Harvey, 176 N.J. 522, 528-29, 826 A.2d 597 (2003) (addressing standard applicable to potential conflicts arising in prosecutor's office). The fact that the existence of an unaddressed conflict may result in reversal of a conviction provides additional weight to the State's motion. See, e.g., State v. Bellucci, 81 N.J. 531, 545-46, 410 A.2d 666 (1980) (imposing an absolute bar to multiple representation, absent waiver); State v. Land, 73 N.J. 24, 35, 372 A.2d 297 (1977); Drisco, supra, 355 N.J.Super. at 291-96, 810 A.2d 81.
We balance these interests against our recognition that, absent an un-waived conflict, a constitutional presumption exists in favor of counsel of one's choice. Jimenez, supra, 175 N.J. at 484, 815 A.2d 976. See also Dewey v. R.J. Reynolds Tobacco Company, 109 N.J. 201, 218, 536 A.2d 243 (1988) (holding that a motion for disqualification "calls for us to balance competing interests, weighing the `need to maintain the highest standards of the profession' against `a client's right freely to choose his counsel'") (quoting Government of India v. Cook Indus. Inc., 569 F.2d 737, 739 (2d Cir.1978)).
RPC 1.7, which governs the conflict of interest analysis in this case, precludes representation of a client if that representation is directly adverse to another client. Of significance here, prior to January 1, 2004, RPC 1.7 additionally provided that: "A lawyer shall not represent a client if the representation of that client may be materially limited by ... the lawyer's own interests." See RPC 1.7(b). The present formulation of that provision states that a "lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: ... there is a significant risk that the representation of one or more clients will be materially limited by ... a personal interest of the lawyer." See RPC 1.7(a)(2). We regard the new formulation of the Rule as incorporating the requirement, found in case law, that a solid foundation exist for any claim of disqualifying conflict of interest.
*285 A federal court has held that in contrast to multiple representation cases, which present unique, straightforward dangers of conflict, self-interest cases "fall along a wide spectrum of ethical sensitivity from merely potential danger to outright criminal misdeeds." Beets v. Scott, 65 F.3d 1258, 1270 (5th Cir.1995), cert. denied, sub nom Beets v. Johnson, 517 U.S. 1157, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996). Accordingly, federal courts have recognized that:
Because of the virtually limitless cases in which a "conflict" may theoretically arise when a lawyer's self-interest is implicated, there is a very real danger of analyzing these issues not on fact but on speculation and conjecture. Accordingly, when a conflict of interest issue arises based on a lawyer's self-interest, a sturdier factual predicate must be evident than when a case concerns multiple representation. Only by requiring a more specific articulation of the facts giving rise to a conflict situation can courts refrain from effectively "straightjacket[ing] counsel in a stifling, redundant... code of professional conduct." [Beets, supra,] at 1272. Supposition and speculation, therefore, will simply not do.

[Treffinger, supra, 18 F.Supp.2d at 432.]
Here, it is significant that defendants Davis, Jones and Gore are Boswell's clients; his client is not the OPD. Although Boswell, as a pool attorney, has a contractual relationship with the OPD, not with his clients, he nonetheless has a duty of fidelity to the client identical to that of a deputy public defender employed by the OPD. See N.J.S.A. 2A:158A-11 ("The primary duty of all members of [OPD] staff and of others engaged on a case basis shall be to the individual defendant, with like effect and to the same purpose as though privately engaged by him and without regard to the use of public funds to provide the service"); Turner v. Department of Human Services, 337 N.J.Super. 474, 478, 767 A.2d 530 (App.Div.), certif. denied, 168 N.J. 294, 773 A.2d 1157 (2001). See also State v. Bell, 90 N.J. 163, 168, 447 A.2d 525 (1982) (holding in a decision permitting representation of co-defendants by different attorneys in the same public defender's officer that because the primary responsibility of an assistant public defender is to represent individual criminal defendants, "we can expect the public defenders to withdraw from the case whenever joint representation may prejudice their clients.")
The State does not assert that Boswell has breached his duty to his clients, but rather raises hypothetical possibilities that such a breach could result if the OPD failed to adequately supervise Boswell or if it unjustifiably withheld resources necessary for Boswell to mount an effective defense. We find that these hypothetical circumstances are insufficient to establish a significant risk of conflict.
Nothing suggests that Boswell, a seasoned criminal defense attorney with extensive experience in trying capital, homicide and other serious criminal cases, would act negligently in these particular proceedings. It is highly unlikely that Boswell would have been assigned these cases by the OPD if it regarded him in any sense negligent or incompetent. Indeed, for Boswell to act negligently would be contrary to his personal interest, since such conduct could provide evidence to support a potential defense by the OPD that Boswell's prior performance as a public defender was substandard. Moreover, we note that, in the two capital prosecutions, Boswell has as his co-counsel an experienced OPD attorney-employee whose presence further safeguards defendants' *286 interests in those cases. See Jimenez, supra, 175 N.J. at 492, 815 A.2d 976 (relying on the presence and advice of cocounsel Joseph Krakora in finding the absence of conflict). Additionally, we note that Boswell, as an attorney, remains bound by the strictures of RPCs 1.1 and 1.3, requiring, respectively, competence and diligence in the representation of a client, and he remains subject to the court's oversight. See RPC 8.4 (stating that it is professional misconduct for a lawyer to violate the Rules of Professional Conduct).
We likewise find sufficient safeguards to guard against the State's second hypothetical scenario, that the OPD might withhold necessary support to Boswell out of retaliation for his suit. The deleterious effect of such conduct on Boswell's pending litigation and the safeguard provided by the appointment of co-counsel in the capital prosecutions are considerations here, as well. Moreover, we note that the OPD is bound by its statutory charge to reasonably provide all services and facilities necessary to the representation of its clients. N.J.S.A. 2A:158A-5. Application to the court for relief can be made if this duty is breached.
In summary, we find in this case that the existence of Boswell's suit, together with governing statutes, rules of professional conduct, and court oversight operate as a check on any tendency toward disservice to the clients that the OPD and Boswell are jointly bound to serve. We find such safeguards to be adequate to guard against any hypothesized negligence or misfeasance on the part of Boswell or the OPD and thus find no actual or potential conflict of interest in Boswell's continued representation of defendants Davis, Jones and Gore. Compare In re Advisory Committee on Professional Ethics, Docket No. 18-98, 162 N.J. 497, 504-05, 745 A.2d 497 (2000) (envisioning "many circumstances" in which the self-interest of a lawyer serving as a municipal administrator would limit his ability to serve as the municipality's attorney).
We recognize that a certain amount of ill will may have been engendered by Boswell's suit. However, RPC 1.7 does not prohibit ill will, but only "tangible conflicts between the lawyer's and the client's interests in the subject matter of the representation." Santa Clara Cty. Counsel Atty's Ass'n v. Woodside, 7 Cal. 4th 525, 28 Cal.Rptr.2d 617, 869 P.2d 1142, 1153, 1157 (1994) (determining that California's conflict of interest statute did not preclude a wage and hours suit by county attorneys against their public employer). See also In re City of Newark, 346 N.J.Super. 460, 469-70, 788 A.2d 776 (App.Div.2002). In the unlikely event that an actual conflict should arise, we can reasonably expect that Boswell would withdraw from the defense of the affected cases. Jimenez, supra, 175 N.J. at 490, 815 A.2d 976; Bell, supra, 90 N.J. at 168, 447 A.2d 525.

III.
The State argues alternatively that, as a result of Boswell's suit, an appearance of impropriety exists requiring Boswell's disqualification.
At the time that the State raised this argument, RPC 1.7(c) provided in relevant part that, in certain cases in which no actual conflict existed, but "an ordinary knowledgeable citizen acquainted with the facts" would conclude that the representation posed a "substantial risk of disservice" to the public interest, that appearance of impropriety would provide an unwaivable bar to representation.[1] This ethical *287 provision was eliminated from the text of RPC 1.7 in the revisions recommended by the Supreme Court Commission on the Rules of Professional Conduct (the Pollock Commission) that were adopted by the Supreme Court, effective on January 1, 2004.
In agreeing to the elimination of this facet of the Rule, the Supreme Court adopted the Pollock Commission's conclusion that "more objective rules better serve the interests of the bench, bar, and public," and that "the Court's constitutional power over practice and procedure through which the judiciary may control the conduct of attorneys in judicial proceedings" can ensure that the standards of the Bar would not be lowered, and that the public would not be exposed to unethical conduct. Administrative Determinations in response to the Report and Recommendation of the Supreme Court Commission on the Rules of Professional Conduct, Commission Comment, RPC 1.7. In further comments, adopted by the Court, the Pollock Commission observed:
The appearance of impropriety provisions in the RPCs seek to reduce the risk of improper conflicts. Because of their vagueness and ambiguity, those provisions, however, are not appropriate as ethics standards....
As stated in RPC 1.7, the appearance-of-impropriety rule prohibits a lawyer from representing a client in those situations "in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." Lawyers and courts can only guess at what an ordinary citizen acquainted with the facts might conclude. Furthermore, a lawyer often cannot ascertain beforehand what that conclusion might be. Thus, the bar does not know whether the conduct will be deemed to create the appearance of impropriety until after the Advisory Committee on Professional Ethics or a court reaches that conclusion.

[Ibid.]
Although the Pollock Commission found the appearance of impropriety rule to be inappropriate as a basis for attorney discipline, it found in a further recommendation adopted by the Court that "a court properly may consider the appearance of impropriety as a factor in determining that ... representation poses an unwarranted risk of disservice either to the public interest or the interest of the client." Ibid.
We agree with the Commission that appearance of impropriety concerns have not been rendered wholly moribund in the present context, particularly in light of the capital prosecutions of two of Boswell's three clients. Jimenez, supra, 175 N.J. at 496, 815 A.2d 976 (Justice Long, dissenting); Loyal, 164 N.J. at 430, 753 A.2d 1073 (stressing the critical nature of public confidence in the fairness of capital proceedings). We therefore consider their implications as part of our analysis of the effect of Boswell's suit on his continuing ability to serve as a defense attorney retained by the OPD.
In conducting this analysis, we recognize as the present underpinning of appearance of impropriety concepts the concern that conduct be examined and, in certain circumstances, regulated that is not at odds with the Rules of Professional Conduct, but that nonetheless may be contrary to the policies underpinning the Rules. See Treffinger, supra, 18 F.Supp. 2d at 434. However, we note as well the Court's frequently-expressed *288 concern that any threat to the spirit of the Rules that is subject to regulation must be more than a fanciful possibility. See, e.g., Jimenez, supra, 175 N.J. at 493, 815 A.2d 976; Loyal, supra, 164 N.J. at 429, 753 A.2d 1073; In re Opinion No. 653, 132 N.J. 124, 132, 623 A.2d 241 (1993); Higgins v. The Advisory Comm. of Professional Ethics on the Sup. Ct. of NJ, 73 N.J. 123, 129, 373 A.2d 372 (1977).
For the reasons that we have expressed previously in determining that no conflict of interest under RPC 1.7 has been presented by Boswell's suit, we find the concerns identified by the State insufficient to suggest either underlying disservice to the public interest or the interest of the client that would alter our view that no actual or potential conflict exists here.
Our determination is reinforced by consideration of the nature of Boswell's suit: an action claiming at its core violations of the New Jersey LAD and CEPA statutes, which have been found to be fundamental to the protection of employee rights in this state. Parker v. M & T Chemicals, 236 N.J.Super. 451, 461-62, 566 A.2d 215 (App. Div.1989) (CEPA); Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied, sub nom, University of Medicine and Dentistry of the State of New Jersey v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988) (LAD); Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982) (LAD).
In a case involving neither the CEPA nor the LAD statutes, but nonetheless relevant here, we have previously determined that municipal attorneys are not precluded by the Rules of Professional Conduct from organizing under a union for the purpose of collectively negotiating the terms of their employment with their client-employer. In re City of Newark, supra, 346 N.J.Super. 460, 788 A.2d 776. There, we rejected the City's position that the "interjection of a union will seriously impair the attorney-client relationship by creating dual loyalties" and that unionization would create an appearance of impropriety under the former RPC 1.7(b) and (c)(2). Id. at 466, 788 A.2d 776. We held:
We find no merit in this contention. There is nothing fundamentally incompatible between the constitutional right of government employees to organize for the purpose of collective negotiations, N.J. Const., art. I, ¶ 19, and the duty of loyalty owed by a municipal attorney to his client.... [T]he American Bar Association... [has] recognized the right of government attorneys and corporate lawyers to organize "for the purpose of negotiating wages, hours, and working conditions" so long as they perform their duties in accordance with ... the Cannons of Ethics. 2 ABA Informal Ethics Opns., No. 986 (July 3, 1967).

[Id. at 467, 788 A.2d 776.]
Moreover, we have held that there is nothing incompatible between the Code of Professional Ethics and New Jersey's Conscientious Employee Protection Act that would serve to bar a former in-house attorney's suit for monetary damages against his former corporate client/employer. Parker, supra, 236 N.J.Super. 451, 566 A.2d 215. There, we reiterated our view that the CEPA legislation constituted "a reaffirmation of this State's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge." Id. at 456, 566 A.2d 215 (quoting Lepore v. National Tool and Mfg. Co., 224 N.J.Super. 463, 470, 540 A.2d 1296 (App.Div.1988), aff'd [and quoted at] 115 N.J. 226, 228, 557 A.2d 1371 (1989)). In rejecting the employer's *289 claim that CEPA as applied to in-house attorneys violated the separation of powers between the judiciary and the legislature, we stressed the congruence between CEPA and the Rules of Professional conduct, stating:
In the situation before us, we see no "conflict with the constitutional judicial powers of the Supreme Court." [Knight v. Margate, 86 N.J. 374, 394, 431 A.2d 833 (1981) ]. The Whistle Blowers Act [CEPA] "serves an important, legitimate governmental purpose clearly within the State['s] police powers and deals with a direct and vital concern of the legislature...." Ibid. The Act does not interfere with the Court's regulation of the legal profession. The Act does not interfere with any legitimate interest of the employer-client. Rather, it reinforces the Court's constitutional mission to encourage and insure the ethical practice of law. We see no constitutional incompatibility and will not read in-house attorneys out of the Act's protection.

[Parker, supra, 236 N.J.Super. at 461-62, 566 A.2d 215.]
Our decisions in City of Newark and Parker both concerned employers as clients and found in that context no fundamental conflict between client and counsel necessarily to arise as the result of our recognition of a right to maintain a job action or suit and no inherent conflict between such job actions and the underlying purposes of the Rules of Professional Conduct. In the present case, the relationship between Boswell and the OPD is more attenuated than it was in the cases that we have just discussed, since the OPD acts as the contract-employer of Boswell, but not as his client. Cf. State v. Rogers, 177 N.J.Super. 365, 374, 426 A.2d 1035 (App. Div.1981) (holding that the Deputy Public Defendant owes allegiance only to his client/defendant), appeal dismissed, 90 N.J. 187, 447 A.2d 537 (1982). We see no reason why this more attenuated relationship should receive greater ethical scrutiny than that accorded in the two cases that we have discussed. To be sure, in Parker, we limited our holding to instances in which a former employee sued for monetary damages. However, we did so out of concern that a broader holding might result in a judicial foisting of an unwanted employee-attorney on a corporate employer through the prevention of his discharge. Parker, supra, 236 N.J.Super. at 460, 566 A.2d 215. That concern does not exist in the present case, since the OPD, by hiring Boswell first as a per diem and then as a pool attorney, signaled its willingness to continue at least a contractual relationship with him.
Given our recognition of the strong policy underpinnings of the CEPA legislation and its compatibility with the Rules of Professional Conduct, and the similarly strong policy considerations underlying the New Jersey LAD, we see no ground in this case upon which to premise a conclusion that Boswell's continued representation at the OPD's request of Davis, Jones and Gore disserves either the public interest or his clients, thereby undermining the intent of the Rules of Professional Conduct. To preclude as a matter of ethics Boswell's representation of defendants simply because he filed CEPA and LAD claims against the OPD would, in essence, deprive Boswell and all like-situated public sector attorneys of a remedy for retaliation and discrimination that is now deeply embedded in our jurisprudence. We are unwilling to take so radical a step on so negligible a foundation. See Santa Clara, supra, 28 Cal.Rptr.2d 617, 869 P.2d at 1154.
In a situation such as this in which none of the individual defendants in Boswell's suit remain in his chain of command, we *290 find no basis upon which to presently conclude that any animosity engendered by the litigation will in the future ripen into a conflict affecting Boswell's representation of his clients in the present proceedings, or in the perception that such would occur. Were we to find otherwise under facts such as these, we would open to unjustifiable challenge the countless criminal cases handled by public sector attorneys who, while engaged in job actions against their employers, have with skill and loyalty represented their assigned clients. See e.g. Walsh v. State, 147 N.J. 595, 689 A.2d 131 (1997)(action by a public defender seeking specific performance of an agreement to promote him).
Nor do we find compelling the State's argument that retention of Boswell as counsel to defendants in these cases will unnecessarily open the proceedings to challenge by means of motions for postconviction relief. If convictions ensue, such proceedings are likely to eventuate under any circumstances. See, e.g., S.G., supra, 175 N.J. at 143, 814 A.2d 612; Loyal, supra, 164 N.J. at 433, 753 A.2d 1073; Drisco, supra, 355 N.J.Super. at 291-93, 810 A.2d 81; State v. Muniz, 260 N.J.Super. 309, 315, 616 A.2d 926 (App.Div.1992).
In reaching our conclusion that no actual or potential conflict exists in this case, and, as a part of that conclusion, that Boswell's continuing representation does not violate the spirit of the Rules of Professional Conduct, we decline Boswell's invitation to render a bright-line pronouncement that an attorney such as he, engaged in suit against his employer, cannot be disqualified on grounds of conflict of interest from the representation of clients to whom he has been assigned. Cases such as this require close analysis of the factual circumstances presented, since we can envision circumstances, for instance, in which the adverse interests of the suing attorney and those he has sued were sufficiently intertwined as to render unsupportable any further relationship. We merely state that we have not been presented with such a case here. We decline to speculate as to how other situations should be resolved.

IV.
The Attorney General, as amicus, while arguing that there is no conflict of interest that would necessitate the disqualification of Boswell, urges us to require that the defendants whom Boswell represents execute "written consent/waivers" covering Boswell's continued representation of them. In light of our conclusion that no conflict of interest exists in this case, we find no ground for imposing the requirement of a written or oral waiver. We regard the colloquy by Judge Sypek with each of the defendants establishing their understanding of the issues raised by the State's motion and their acquiescence in Boswell's continued representation to have satisfied any informational procedures required as a result of the Supreme Court's decision in Jimenez, 175 N.J. at 493-94, 815 A.2d 976. We express no opinion as to whether such procedures are necessary when, as here, the alleged conflict, unlike that in Jimenez, arises out of matters that are wholly extraneous to defendants' criminal prosecutions.
The decision of the trial court is affirmed.
NOTES
[1] The appearance of impropriety provisions of RPC 1.7 are framed solely in terms of multiple representation. It is nonetheless clear that the Rule applies as well to conflicts arising from self-interest or other factors. See Treffinger, supra, 18 F.Supp.2d at 434.