**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2501-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KANEM WILLIAMSON,

     Defendant-Appellant.

_____

Submitted October 3, 2019 – Decided January 9, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-08-1937.

Joseph E. Krakora, Public Defender, attorney for appellant (Robert Carter Pierce, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Barbara A. Rosenkrans, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Tried to a jury, defendant Kanem Williamson was convicted of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1),[1] second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). On December 1, 2017, the trial judge sentenced defendant on the aggravated manslaughter to twenty-five years imprisonment, subject to the No Early Release Act's eighty-five percent parole disqualifier, N.J.S.A. 2C:43-7.2, and imposed a concurrent eight-year term subject to four years of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c), on the unlawful possession of a weapon. The judge merged the possession of a weapon for an unlawful purpose into the aggravated manslaughter count.

Defendant appeals, making the central argument that admission of the video of the victim A.B.'s dying declaration was prejudicial error mandating reversal and a new trial. However, we conclude the circumstances surrounding A.B.'s identification of defendant warranted the trial judge's decision to admit it. We further conclude that this dying declaration was an exception to

---

[1] The jury convicted defendant of a lesser-included offense—he was tried on a charge of purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1), (2).

Crawford's proscription against the use of testimonial statements in a criminal case,[2] and thus affirm.

## The Pretrial Hearings

The trial judge found A.B.'s identification of defendant, a dying declaration, was admissible after conducting a pretrial N.J.R.E. 104 hearing. See N.J.R.E. 804(b)(2). The following facts were developed at the hearing.

A paramedic who arrived at the scene at approximately 1:04 p.m. on May 5, 2014 found A.B. "unconscious, unresponsive and not breathing[,]" having been shot multiple times. The paramedic measured A.B.'s responsiveness utilizing the Glasgow Coma Scale,[3] scoring her reactions three out of a possible

---

[2] Crawford v. Washington, 541 U.S. 36, 54 (2004).

[3] The Glasgow Coma Scale:

> takes into account three aspects: the ability to move, the ability to speak, and the ability to move one's eyes around. The worst score a person can have is one point in each of the three categories, a Glasgow Coma score of [three]. . . . [A] dead body would have a score of [three]. The best possible score, the score for a normal healthy person, is a score of [fifteen]. . . . A score of [eight] means the brain is severely injured and the person cannot protect his or her airway from aspirating vomit.

> [People v. Delgado, 153 Cal. Rptr. 3d 260, 263 (Cal. Ct. App. 2013).]

fifteen points. She initially had no pulse, but was revived after the administration of epinephrine to restart her heart.

A.B. arrived at the hospital unconscious, "extremely unstable[,]" and experiencing "traumatic arrest" as a result of multiple gunshot wounds. Dr. Anastasia Kunac, M.D., testified that A.B. had an entry wound near her spinal cord and required an endotracheal tube to assist her with breathing. Approximately two hours after her arrival, A.B. began to stir and tried to speak. At that time, Kunac informed her that she had been shot multiple times, that her heart had been restarted, and that she could not move her extremities or breathe on her own due to the spinal injury. When told about her condition, A.B. became upset and "visibly tearful." Based on her observations, Kunac believed A.B. was aware of the gravity of her injury, knew she was still in critical condition, and, as the doctor phrased it, "at imminent risk of death." Kunac informed A.B. and her family that A.B. "could" die.

Newark Police Department Detective Filiberto Padilla was assigned to investigate. When Padilla met with A.B. at the hospital, he thought that "[s]he was going to die." Using his cell phone, he video recorded his interview with

A.B. in her hospital bed, during which he showed her defendant's mugshot. He had earlier acquired information pointing to defendant as a suspect.[4]

Padilla asked A.B. a series of questions, requesting that she nod to answer yes or no:

> DETECTIVE PADILLA: Listen, if I showed you a picture of who did this, would you know who it is? [A.B. nods her head up and down.]
>
> . . . .
>
> DETECTIVE PADILLA: Do you know who shot you? [A.B. nods her head up and down.] Just nod your head. Do you know who -- where you're at, at this present time? Yes? [A.B. nods her head up and down.] The person that did this to you, have you known him for a while? [A.B. nods her head up and down.] Is he from the complex? [A.B. nods her head up and down.] . . . Just take a look at this picture, okay? And tell me if you recognize this person. [A.B. nods her head up and down.] You're saying, yes? – is . . . the person on this picture the person that shot you earlier today? [A.B. nods her head up and down.] Have any -- did you have any arguments with him earlier today in reference to anything? Yes, or no? No? [A.B. nods her head side to side.] And you -- you're sure that this is the person that shot you? Yes? [A.B. nods her head up and down.]

While on the stand, Kunac watched the video of the interview. She said that not only could A.B. move her head to indicate yes or no, but that given the

---

[4]  Among other things, at trial, references were made to a Facebook posting about the shooting suggesting that defendant was the perpetrator.

absence of any traumatic head injury or medications which would affect her lucidity, she likely understood what was taking place.

After A.B. identified defendant's picture, Padilla signed the back of the photo since A.B. could not. She was hospitalized for three months and was later transferred to a rehabilitation facility. She died as a result of her injuries in April 2015.[5]

The judge found the three state witnesses, the paramedic, Kunac, and Padilla, to be credible. She further found that when A.B. identified defendant as the shooter, she was aware of the extent of her injuries and the possibility of imminent death, as A.B. was in "critical condition." Since A.B. "believed she was in imminent threat of death[,] [h]er answers to Detective Padilla's questions were voluntary and were made in good faith and, as such, should be admitted into evidence under Evidence Rule 804(b)(2), commonly known as a dying declaration."

The trial judge also concluded admission of the statement did not violate defendant's right to confront his accuser because the sole purpose of eliciting the identification was to meet an "ongoing emergency." It was "imperative to

---

[5] The medical examiner opined A.B.'s cause of death was complications from the gunshot wounds, and the manner of death was homicide.

identify the shooter and neutralize the threat to the community." Therefore, no confrontation clause violation occurred, and the exception to the hearsay rule applied.

Additionally, defendant argued that A.B.'s out-of-court identification should be suppressed because Padilla failed to properly memorialize the identification procedure, the identification process grossly violated the attorney general guidelines, and defendant's confrontation clause rights would be violated if the dying declaration were admitted. The court denied this application as well, observing that the arguments challenging the viability of the statement as a dying declaration did not significantly differ from the arguments made in opposition to its admission.

Lastly, the judge denied defendant's Wade application. She found the identification process was not impermissibly suggestive, and even if suggestive, the process was nonetheless reliable because A.B. was acquainted with defendant before the incident.

### The Trial

Among others, the State called the paramedic, Padilla, and Kunac as witnesses during the trial. The prosecutor asked the court to find A.B.'s video recorded dying declaration was authentic, in reliance on the pretrial order. The

A-2501-17T3

purpose of the State's application was to avoid defendant making a chain of custody argument before the jury. Defense counsel argued that admission should be made based on necessary protocols establishing chain of custody. The court ruled as follows:

> it was very clear that this was a tape taken at that time, . . . I felt that there was no manipulation in the tape. I was satisfied with it and my understanding is that the main reason we were having the hearing was to determine if it was going to be admitted into evidence. When I stated that I was going to allow it into evidence, . . . I gave an extensive opinion that I had written and then just read into the record, when I gave my reasoning as to why I was going to allow these things into the record, and I believe that was on August 15th, 2016.
>
> I would adopt all those same reasons in which we had arguments pertaining to the confrontation clause, the dying declaration, but I believed then and I believe now that it is fully admissible into the trial and I am going to allow it in.

The prosecutor played the video for the jury.

The State also showed the jury a building security tape of the incident. It depicts an African American male with short hair and red or orange pants, whom the State submitted was defendant, sitting on the steps in front of an apartment complex in conversation with three other men, at approximately 12:54 p.m. One of the three men goes inside, while defendant and two others remain talking on the stairs. At around 12:55 p.m., A.B. is seen approaching while on her cell

8

phone. She initially ignores the men on the stairs, but turns to say something to them at about 12:55:51 p.m. After A.B. turns to walk away, the male in the red pants begins to respond, and the two appear to argue. The conversation ends around 12:56:20 p.m. At 12:56:27 p.m., A.B. begins to walk back towards the stairs of the complex, seemingly yelling. Immediately, the man in red pants jumps to his feet, brandishing a handgun, and shoots repeatedly at A.B. as she approaches. The man flees at 12:56:35 p.m. In the security footage, A.B. is seen lying on the stairs in a pool of blood, as a crowd gathers around her.

Eleven nine-millimeter bullet shell casings, a cell phone, and a replica handgun were recovered from the area. When Padilla learned a man known as "June June," defendant, may have been involved, he went to "June June's" address and spoke with Kanem Morris, defendant's father. Morris told police his son admitted shooting A.B. during an argument, and had left the residence moments before police arrived.

That same evening, at around 8:50 p.m., Morris made a recorded statement about the shooting at the police station. In the statement, played in the courtroom after the jury was dismissed, Morris said he learned that A.B. had been shot while visiting a friend at University Hospital. A.B.'s sister, a family friend, saw Morris in the hallway and told him that his son was the shooter.

Morris explained that "they all know each other," referring to defendant and A.B., because they lived in the same apartment complex.

As Morris and A.B.'s sister were talking in the hospital hallway, other acquaintances began to surround him asking questions about the shooting. When Morris encountered defendant shortly thereafter, he asked him about the incident, and defendant told him he had been arguing with A.B. about money. Defendant said he shot A.B. after she pulled a gun on him. Morris asked defendant to remain and cooperate, but defendant fled when Morris told him the police were on their way.

A redacted version of Morris's statement regarding defendant's admission was played to the jury. At trial, when confronted with his description of defendant's admissions, Morris claimed he only agreed to talk to police because he thought there was a "shoot on sight" order against his son, which Padilla denied existed. Morris ultimately alleged his statement "got messed up" and that he must have misunderstood defendant. Morris signed an affidavit claiming his recorded statement to police was "mendacious."

Police interviewed Kareem Brown, one of the individuals in front of the building when A.B. was shot. He had been talking to Manuel De Los Reyes on the stairs when A.B. walked by acting "chaotic[.]" When defendant approached

A-2501-17T3

the group, he began to argue with A.B. Brown recalled defendant wearing red North Face pants that day. According to Brown, defendant suddenly "blew up" and shot A.B. Brown said A.B. was known to carry a gun, but that at that moment, despite acting chaotic earlier, he did not view her as a threat. Brown believed, however, that defendant did feel threatened as a gun was visible on A.B.'s waistband. At the close of the interview, Brown signed the back of a photograph of defendant, and confirmed he was the person who shot A.B. He also agreed that he participated in the interview "totally on [his own] free will." Brown's statement was played to the jury.

At trial, Brown claimed that the man in red pants depicted on the security tape was a person who had since passed away. He said A.B. acted "hostile" that day and that her "attitude was chaotic." Brown also said she paced back and forth and had a gun. He recanted his earlier statements to police, alleging he was coerced into saying something to Padilla that "he didn't want to say." After leaving the police station, Brown consulted with a friend who was "sharp with the law," and he submitted a sworn affidavit stating that his prior statement to police was untruthful because he had been high on drugs and uncomfortable.

11

After defendant's arrest, police seized a nine-millimeter handgun during a traffic stop. According to the ballistics expert, the shell casings found at the scene matched the recovered handgun.

During the State's summation, the prosecutor said the following:

> For the defense to argue that the other facilities left [A.B.] to die <u>is disingenuous and it's disgusting.</u> These medical facilities had her for [eleven] months while she continued to deteriorate. And we heard Detective Padilla went to go visit her and her condition continued to worsen. Medical personnel were able to keep her alive for 11 months. It took less than 11 seconds for the defendant to put her in that situation.
>
>     . . . .
>
> The State submits when you first heard the openings, <u>the defense told you there's a cloak of innocence over the defendant. That cloak is gone.</u> You've now heard all the proofs in the case and they point to one person, the defendant. You now have the identifications, you now have the videos, you have the statement from [A.B.], you have the photographs, you have the physical items and the testimony and all those items show that <u>on May 5th, 2014 this defendant butchered [A.B.] by shooting at her 11 times,</u> and I ask you to return the only verdict that's consistent with the facts in this case and that is that this defendant is guilty, guilty, guilty. Thank you.
>
> [(Emphasis added).]

Defendant objected to the prosecutor's use of the term "butcher" but nothing else. The court overruled the objection.

Defendant raises seven points on appeal:

POINT I
THE PROSECUTION'S EVIDENCE ESTABLISHED
THAT THE VICTIM DID <u>NOT</u> BELIEVE DEATH
WAS IMMINENT WHEN SHE ALLEGEDLY MADE
THE PHOTO IDENTIFICATION; BECAUSE THERE
IS NO PROOF THE VICTIM UNDERSTOOD OR
BELIEVED HER DEATH TO BE IMMINENT, THE
IDENTIFICATION CANNOT BE ADMITTED
UNDER THE DYING-DECLARATION HEARSAY
EXCEPTION.

POINT II
THE TRIAL COURT DEPRIVED MR.
WILLIAMSON OF HIS SIXTH AMENDMENT
RIGHT TO CONFRONTATION BY ADMITTING IN
EVIDENCE THE ORDER GRANTING THE STATE'S
MOTION TO INTRODUCE IN EVIDENCE THE
VICTIM'S DYING DECLARATION PHOTO
IDENTIFICATION.

POINT III
THE TRIAL COURT ERRED BY DENYING MR.
WILLIAMSON'S MOTION TO SUPPRESS THE
SHOW-UP IDENTIFICATION BECAUSE THERE
WAS AN INADEQUATE RECORD OF THE
IDENTIFICATION PROCEDURE IN VIOLATION
OF [<u>Rule</u>] 3:11.

POINT IV
THE TRIAL COURT ERRED BY ALLOWING THE
OUT-OF-COURT PHOTO IDENTIFICATION TO BE
USED AT TRIAL, WITHOUT FIRST CONDUCTING
A <u>WADE</u> HEARING, BECAUSE THE PROCEDURE
DID NOT SATISFY THE CONSTITUTIONAL
STANDARDS OF RELIABILITY.

POINT V
THE TRIAL COURT DEPRIVED MR. WILLIAMSON OF A FAIR TRIAL BY REFUSING TO ALLOW TESTIMONY OF THIRD-PARTY GUILT IN THAT THE VICTIM WAS THE STATE'S STAR WITNESS IN A MURDER PROSECUTION AGAINST A KNOWN "BLOOD" GANG MEMBER AT THE TIME WHEN SHE WAS MURDERED.

POINT VI
THE PROSECUTOR COMMITTED MISCONDUCT DURING SUMMATION BY STATING THAT (A) "THE CLOAK OF INNOCENCE" OVER MR. WILLIAMSON IS NOW "GONE" (Not Raised Below); (B) MR. WILLIAMSON "BUTCHERED" THE VICTIM; AND (C) MR. WILLIAMSON'S DEFENSE IS "DISINGENUOUS AND IT'S DISGUSTING" (Not Raised Below), WHICH DEPRIVED MR. WILLIAMSON OF A FAIR TRIAL.

POINT VII
THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE AND THE TRIAL COURT ERRED BY NOT GIVING MR. WILLIAMSON 1301 DAYS OF GAP TIME CREDIT.

Appellate review of a trial court's evidentiary determinations is limited to examining the decision for abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). In doing so, the reviewing court may not "create anew the record on which the trial court's admissibility determination was based." Ibid. Generally, evidentiary determinations are given considerable latitude and will not be disturbed unless the decision was so "wide of the mark that a manifest denial of

14

justice resulted." State v. Kuropchak, 221 N.J. 368, 385-86 (2015) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

## I.

## A.

We first address defendant's contention that the admission of A.B.'s dying declaration was error because when she made it she did not believe her death was imminent. As a general matter, "statement[s], other than [those] made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[,]" are hearsay and inadmissible as evidence. N.J.R.E. 801(c); N.J.R.E. 802. Certain exceptions to the hearsay rule apply, however, if a declarant is "unavailable." N.J.R.E. 804. Those exceptions include an unavailable declarant's statement made "under belief of imminent death"—commonly referred to as a "dying declaration." N.J.R.E. 804(b)(2). Under this particular hearsay exception, "a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." Ibid. "Although there is no controlling New Jersey authority explaining 'belief of imminent death,' the United States Supreme Court has held that '[d]espair of recovery may indeed be gathered from the circumstances if the facts

support the inference.'" State v. Prall, 231 N.J. 567, 585 (2018) (quoting

Shepard v. United States, 290 U.S. 96, 100 (1933)).

In assessing admission, the courts will look to:

> all the attendant circumstances . . . including [1] the
> weapon which wounded him, [2] the nature and extent
> of his injuries, [3] his physical condition, [4] his
> conduct, and [5] what was said to and by him. [Citations
> omitted] Whether the attendant facts and circumstances
> of the case warrant the admission of a statement as a
> dying declaration is in the first instance for the court,
> but, when admitted, the declarant's state of mind and
> the credibility, interpretation and weight to be given his
> statement are for the jury under proper instructions.
>
> [State v. Hegel, 113 N.J. Super. 193, 201 (App. Div.
> 1971) (sixth alteration in original) (citation omitted)
> (quoting Commonwealth v. Knable, 85 A.2d 114, 117
> (Pa. 1982)).]

A.B. was never informed at the hospital that she was going to die,

however, Kunac told her she was in critical condition and "could" die.  Police

interviewed A.B. shortly after she regained consciousness.  She knew she had

been shot multiple times, her heart had stopped and been restarted, and that she

was in critical condition.  Kunac confirmed that A.B. was lucid, understood the

gravity of her injures, and responded to the information about her medical status

with visible sadness and tears.

Defendant nonetheless argues there was insufficient evidence for the court to conclude that A.B. believed, or was conscious of, the possibility of imminent death. In support of the argument, he relies on a Third Circuit case in which the victim was shot three times and paralyzed. United States v. Lawrence, 349 F.3d 109, 111-12 (3d Cir. 2003). That court held the victim's statement to police was not a dying declaration because neither the victim, nor medical staff, thought he faced death at the time the statement was made, and he was able to actually name the person who shot him. Id. at 116-17. The facts in Lawrence, however, significantly differ from what occurred here. The victim in Lawrence was able to speak to police at the crime scene and never lost consciousness. Id. at 112.

Unlike the victim in Lawrence, A.B. arrived at the hospital as a "traumatic arrest" patient, both comatose and unresponsive, with a Glasgow score of three. When she awoke after intense resuscitation efforts, the doctor informed her of her injuries and the possibility of death. The medical staff believed A.B. could die—and conveyed that notion to her. A.B. had every reason to believe death was imminent.

A.B. was found lifeless at the crime scene with no detectible pulse. Although resuscitated, she arrived at the hospital extremely unstable, in a comatose and unresponsive state. Kunac could not remember, verbatim, her

A-2501-17T3

exact words to A.B. when she regained consciousness. But even if Kunac had only conveyed a basic summary of her medical status, a similarly situated person would have feared death was imminent.

A.B. died before the pretrial hearing took place. Without knowing how she felt when interviewed, the court could only weigh and assess the testimony of others—the paramedics, Padilla, Kunac—at the time she made the identification. In looking to the Hegel factors, we conclude the judge did not err in finding A.B.'s statement to police, under all the attendant circumstances, was made under belief of imminent death and was therefore a dying declaration.

B.

Defendant asserts that by taking judicial notice of its August 1, 2017 order admitting A.B.'s statements as a dying declaration, the judge deprived the jury of the opportunity to decide on its own whether A.B.'s identification of defendant was accurate. This point lacks merit. A jury can always reject or accept evidence presented to them. In this case, as in every case, they were instructed to independently weigh the evidence in determining whether the State had proven its case beyond a reasonable doubt.

The right of a criminal defendant to confront witnesses against him is well grounded in Constitutional and New Jersey Law. U.S. Const. amend. VI; N.J.

Const. art. I, ¶ 10. "The Confrontation Clause generally prohibits the use of out-of-court testimonial statements by an absent witness who has not been subject to cross-examination." State v. Roach, 219 N.J. 58, 85 (2014) (Albin, J. dissenting) (citing Crawford, 541 U.S. at 51). Critical to this rule, however, is the difference between testimonial and nontestimonial statements. See Davis v. Washington, 547 U.S. 813, 821-22 (2006).

Testimonial statements are those made in the course of an interrogation, with the "primary purpose . . . to establish or prove past events potentially relevant to later criminal prosecution." Id. at 822. Conversely, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Ibid. Only testimonial statements trigger a defendant's right to confrontation. Id. at 821.

A defendant's right to confrontation is not violated, however, if evidence is admitted where a "'firmly rooted' hearsay exception or 'particularized guarantees of trustworthiness' assure its reliability." State v. Miller, 170 N.J. 417, 425-26 (2002) (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)). The Confrontation Clause may also serve to ensure "reliability of the evidence

[admitted] against a criminal defendant by subjecting it to rigorous testing . . . ." Id. at 425 (quoting Maryland v. Craig, 497 U.S. 836, 845 (1990)).

After the earlier finding that A.B.'s statement was a dying declaration, the court found the interrogation was nontestimonial because Padilla testified that the primary purpose of speaking with A.B. was to address an ongoing emergency, since the shooter was still at large. Given that the armed suspect fled the scene, the police were obliged to address the ongoing emergency and question the victim, who after being shot at close range several times, had just regained consciousness.

The United States Supreme Court has not directly addressed the dying declaration exception after Crawford. However, the Court has held in a similar scenario that a victim's dying declaration to police identifying an assailant was non-testimonial because it was obtained to enable police to meet an ongoing emergency. Michigan v. Bryant, 562 U.S. 344, 378 (2011).

The New Jersey Supreme Court has not ruled on this issue. A number of other state courts have, prior to Bryant, and admitted such statements, although on a different theory. For example, the Supreme Court of California has said:

> Dying declarations were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken. In particular, the common law allowed the declaration of the deceased,

20

A-2501-17T3

after the mortal blow, as to the fact itself, and the party by whom it was committed, provided that the deceased at the time of making such declarations was conscious of his danger. To exclude such evidence as violative of the right to confrontation would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught. But dying declarations, made under certain circumstances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished. Thus, if, as Crawford teaches, the confrontation clause is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment. We therefore conclude the admission of Patel's dying declaration was not error.

[People v. Monterroso, 101 P.3d 956, 972 (Cal. 2004) (citations omitted) (quotations omitted).]

Other courts have engaged in the same analysis. See Commonwealth v. Nesbitt, 892 N.E.2d 299, 310 (Mass. 2008) ("The confrontation clause 'is most naturally read as a reference to the right of confrontation at common law,'" which recognized dying declarations as an exception to the right of confrontation); State v. Jones, 197 P.3d 815, 822 (Kan. 2008) ("[W]e are confident that, when given the opportunity to do so, the Supreme Court would

21

confirm that a dying declaration may be admitted into evidence, even when it is testimonial and unconfronted."); Harkins v. State, 143 P.3d 706, 711 (Nev. 2006) ("[B]ecause dying declarations were recognized at common law as an exception to the right of confrontation, they should continue to be recognized as an exception."); People v. Taylor, 737 N.W.2d 790, 794 (Mich. Ct. App. 2007) ("For the reasons stated by the Supreme Court of California, we hold that, under Crawford, dying declarations are admissible as an historical exception to the Confrontation Clause."); State v. Bodden, 661 S.E.2d 23, 29 (N.C. Ct. App. 2008) ("Monterroso and cases from other jurisdictions mirror our conclusion that the confrontation clause allows an exception for testimonial dying declarations.").

Thus, pursuant to the United States Supreme Court's "ongoing emergency" doctrine, and historic precedent regarding exceptions to the confrontation clause, A.B.'s dying declaration is admissible. This exception to the hearsay rule, as embodied in N.J.R.E. 804(b)(2), continues to be viable even post-Crawford. The judge did not abuse her discretion in admitting the evidence.

## II.

Defendant contends admission of the dying declaration was prejudicial error both because there were inadequate procedural safeguards when the record

was created and because a <u>Wade</u> hearing was required, and none was conducted. He further argues that a <u>Wade</u> hearing was necessary because the identification procedure involving A.B. was impermissibly suggestive, and the police recordkeeping violated <u>Rule</u> 3:11.

A.B., while in her hospital bed, could not easily communicate. The police conducted and recorded the interview as best they could. A.B. knew defendant—which Padilla knew before going to the hospital. Showing A.B. a photograph of the suspect identified by other means, and recording the interview on the officer's cell phone was therefore not violative of New Jersey's witness identification procedures or impermissibly suggestive.

The Court said in <u>State v. Anthony</u>, 237 N.J. 213, 233-34 (2019), that a defendant is entitled to a pretrial hearing on the admissibility of identification evidence only where "no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared." Certainly, as defendant suggests, the officer could have more closely adhered to the letter of the attorney general guidelines, for example, by stating to A.B. that the photograph she was being shown was of a person who "may or may not be the culprit." Under the circumstances, however, what took place followed the spirit of the guidelines and complied with the rule.

In speaking to A.B., Padilla first asked if she knew the person that shot her. All A.B. could do was nod her head to indicate assent—a gesture captured on the video. Padilla asked A.B. if she had known the perpetrator "for a while," to which she also assented. Padilla asked A.B. if she recognized the person in the photo she was shown, a statement with which A.B. agreed—as she did the latter question—whether the person depicted in the photo "shot you earlier today?" A.B. denied arguing with the person before the shooting. The officer then asked if she was "sure" that the person in the picture was the shooter—and she again nodded.

To suggest the officer should have mechanically adhered to the procedures given this death bed identification is not realistic. A.B.'s energy was limited. The interview could not be conducted elsewhere or more slowly. Knowing A.B. might die, the officer did the best he could, and did not suggest to A.B. that she was being shown a photo of the shooter.

The trial court enjoys the discretion to determine whether an identification is reliable. State v. Henderson, 208 N.J. 208, 289 (2011). The requirements of the rule were satisfied in light of the unusual circumstances of the taking of the statement. See Anthony, 237 N.J. at 233-34. The identification process was not

impermissibly suggestive when the officer's actual words are considered. Thus, the trial court's decision was not error.

## III.

Defendant contends that the court should have permitted testimony regarding third-party guilt because A.B. was a principal witness in a case involving a Bloods gang member. The argument that third-party guilt should have been presented to the jury has no basis in the record and thus lacks merit.

"A defendant is entitled to prove his innocence by showing that someone else committed the crime with which he or she is charged." State v. Jimenez, 175 N.J. 475, 486 (2003). "There must, however, be some evidence of third-party guilt to permit the defense to argue the point." Ibid. At a minimum, this requires evidence "capable of raising a reasonable doubt of defendant's guilt." Ibid. (quoting State v. Koedatich, 112 N.J. 225, 299 (1988)). In other words, the proof offered must have "a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." State v. Cotto, 182 N.J. 316, 332 (2005) (quoting State v. Fortin, 178 N.J. 540, 591 (2004)). The third-party cannot be linked to the crime by mere speculation, Koedatich, 112 N.J. at 299-300, or otherwise inadmissible evidence. Cotto, 182 N.J. at 334 (citing Fortin, 178 N.J. 591). Because this determination requires a fact-sensitive

inquiry, "trial courts retain broad discretion to admit or preclude evidence of third-party guilt." Id. at 333.

Nothing about the security video, the video of A.B.'s statement, defendant's statement to his father, or statements made by others who witnessed the shooting, suggested third-party involvement. Even if the male depicted in the security video could not be identified other than by the color of his pants, it does not support the claim. The shooter did not walk up to A.B. and shoot her execution-style, as defendant suggests. The video depicts defendant standing and talking in a group on the steps of an apartment building, A.B. passing by, and the two beginning to argue. The escalation depicted on the video supports the version of the event the State presented—to have allowed a third-party guilt claim would have been highly prejudicial and would not have been grounded on any available facts.

## IV.

Defendant draws our attention to three specific comments made by the prosecutor he alleges prejudiced his due process right to a fair trial. We do not agree that the arguments were prejudicial or clearly capable of producing an unjust result. The comments, while improper, were ultimately harmless error in light of the proofs.

A-2501-17T3

A prosecutor's summation is examined for misconduct "in the context of the entire trial . . . ." State v. Morton, 155 N.J. 383, 419 (1998). This necessarily includes statements made by the defense counsel, such as their "opening salvo" or prosecutorial comments attempting to "right the scale" in response. State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (citing United States v. Young, 470 U.S. 1, 12-13 (1985)). In order to justify reversal, the prosecutor's summation must have been "clearly and unmistakably improper," and must have "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Wakefield, 190 N.J. 397, 438 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).

Challenges to statements which were not objected to below, are addressed under the "plain error" standard. R. 2:10-2; R. 1:7-2. Moreover, when overwhelming proof exists in the matter, certain errors by the trial court may be considered "harmless beyond a reasonable doubt." See State v. Tillery, 238 N.J. 293, 319 (2019); State v. Weaver, 219 N.J. 131, 154-55 (2014).

"It is well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations." State v. Williams, 113 N.J. 393, 447 (1988). As such, "not every deviation from the legal prescriptions governing prosecutorial conduct" requires

27

reversal.  Id. at 452 (citing State v. Bucanis, 26 N.J. 45, 56 (1958)).  Nonetheless, "[a]lthough prosecutors may make vigorous and forceful closing arguments, their primary duty is not to convict but to see that justice is done."  State v. Neal, 361 N.J. Super. 522, 535 (App. Div. 2003) (citing State v. Timmendequas, 161 N.J. 515, 587 (1999)).  "Prosecutorial misconduct constitutes grounds for reversal when it is so egregious as to deprive the defendant of a fair trial."  Ibid. If, however, the trial court directly addresses the issue with "a timely and effective limiting instruction," the potential prejudice may be cured.  State v. Jackson, 211 N.J. 394, 413 (2012).

Defendant contends the prosecutor's statement, in his closing that "when you first heard the openings, the defense told you there's a cloak of innocence over the defendant[,] [t]hat cloak is gone[,]" constitutes reversible error.  He argues it impermissibly shifted the burden of proof away from the State, and deprived him of the presumption of innocence.  No objection was made at trial.

A criminal defendant is presumed innocent until each element of a crime is proved beyond a reasonable doubt.  A summation which has the effect of shifting this burden of proof, or otherwise tampering with a defendant's presumption of innocence, ordinarily warrants a remand.  State v. Jones, 364 N.J. Super. 376, 382 (App. Div. 2003) (holding a prosecutor's remark which

seemed to place the burden on defendant to submit to fingerprint testing, was "clearly erroneous and so capable of affecting the jury's deliberations").

In stating defendant's cloak of innocence was now gone, the State came dangerously close to implying that it had sufficiently proved its case before the jury deliberated. This statement, in the absence of immediate corrective instruction, was improper.

In defense of the language, the State argues it was entitled to make "vigorous and forceful closing arguments," State v. Mahoney, 188 N.J. 359, 376 (2006) (quoting State v. Frost, 158 N.J. 76, 82 (1999)), and that the words were a mere comment on the evidence. Indeed, the State was not prohibited from commenting on defendant's metaphor regarding the "cloak of innocence" during his opening and summation, nor was it prevented from commenting on the defense's opening and closing statements. See Engel, 249 N.J. Super. at 379. Notwithstanding, the State was not entitled to modify the metaphor, telling the jury its review of the case was complete because defendant was no longer presumed innocent.

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Timmendequas, 161 N.J. at 576. This is because "[f]ailure to make a timely objection indicates that defense counsel did

not believe the remarks were prejudicial at the time they were made." Ibid. (citing State v. Irving, 114 N.J. 427, 444 (1989)).

The jury was told in the judge's opening and closing instructions, however, that defendant had to be found guilty beyond a reasonable doubt. The cloak of innocence continued to protect defendant only if and until the jury itself found the State sufficiently proved each element of his crimes beyond a reasonable doubt. Furthermore, the State presented powerful proofs against defendant, including the victim's identification, statements by defendant's father and a friend, and the video of the incident. In context, therefore, the prosecutor's ill-advised comment, made in response to defendant's rhetorical flourish, was harmless error. This comment alone, which preceded the judge's repeated instruction regarding the State's burden of proof, could not have prejudiced defendant's right to a fair trial.

Defendant also argues that the prosecutor's characterization of him as a "butcher," to which counsel did object, was reversible error. The prosecutor made the reference twice during openings, and twice during summation. It is clear the language was intended to inflame the jury. In light of the overwhelming evidence against defendant in this case, however, the characterization does not warrant reversal. A.B. was shot at close range multiple

times. More than anything the comment was unnecessary—the proofs spoke for themselves.

Defendant had argued that he did not kill A.B., but that she died as a result of poor hospital care. Without objection, the prosecutor characterized defendant's position as "disingenuous and . . . disgusting[.]" The State is entitled to make vigorous and forceful comments. State v. Mahoney, 188 N.J. 359, 376 (2006). This characterization moved beyond that boundary. However, it did not deprive defendant of a fair trial in light of the entire record.

When reviewing a prosecutor's summation, we examine questionable comments "in the context of the entire trial" and taken as a whole. Morton, 155 N.J. at 419. Here, the three comments challenged by defendant, individually or in the aggregate, did not "substantially prejudic[e] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Wakefield, 190 N.J. at 438 (quoting Papasavvas, 163 N.J. at 625). Although improper, they were not so egregious as to deprive defendant of a fair trial. See ibid.

## V.

Defendant in his final point contends that the sentence the court imposed was excessive, and that he should have been credited for 1301 days of gap time. We note first that no argument in support of gap time credit is included in the

brief. Accordingly, we will consider the issue to have been abandoned. See

Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001).

Our review of a criminal sentence is limited to determining whether there

was a "clear showing of abuse of discretion." State v. Bolvito, 217 N.J. 221,

228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)). In accordance

with this deferential standard, we do not substitute our judgment for that of the

sentencing court. State v. Fuentes, 217 N.J. 57, 70 (2014). Indeed, we affirm

the sentence unless,

> (1) the sentencing guidelines were violated; (2) the
> aggravating and mitigating factors found by the
> sentencing court were not based upon competent and
> credible evidence in the record; or (3) "the application
> of the guidelines to the facts of [the] case makes the
> sentence clearly unreasonable so as to shock the
> judicial conscience."
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65
> (1984)).]

"Whether a sentence should gravitate toward the upper or lower end of the

range depends on a balancing of the relevant factors." State v. Case, 220 N.J.

49, 64 (2014). "[W]hen the mitigating factors preponderate, sentences will tend

toward the lower end of the range, and when the aggravating factors

preponderate, sentences will tend toward the higher end of the range." Id. at 64-

65 (quoting State v. Natale, 184 N.J. 458, 488 (2005)). Rather than merely

counting the factors, "the court must qualitatively assess the relevant aggravating and mitigating factors, assigning each factor its appropriate weight." Id. at 65.

The trial judge sentenced defendant in the high mid-range. Contrary to defendant's argument on appeal, the judge did consider defendant's youth. But she noted he had been in custody most of the time since he became an adult. Her finding that aggravating factors three, six, and nine applied had support in the record. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge found no mitigating factors—this conclusion is also supported by the record.

The judge explained her decision to impose a term of imprisonment of twenty-five years as necessary because of defendant's progressively wrongful conduct, culminating in a homicide. Thus, she did not abuse her sentencing discretion. The sentence does not shock the judicial conscience. See Roth, 95 N.J. at 364-65.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2501-17T3